United States District Court
Southern District of Texas
**ENTERED**
December 08, 2021
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| CHRISTIANA CAMPOS and LENA CORTEZ, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Case No. 6:20-CV-00055 |
| CITY OF PORT LAVACA, TEXAS, JOSE PENA, JUAN OBREGON, and KYLE CURTIS, | § § § § | |
| Defendants. | § § § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Christiana Campos and Lena Cortez, as next of friend of minor L.C.A., allege that Officer Jose Pena, Officer Juan Obregon, and Officer Kyle Curtis (1) unlawfully arrested Campos and used excessive force against her in violation of her Fourth Amendment right to be free from unreasonable searches and seizures, and (2) detained L.C.A. unlawfully. Campos and L.C.A. filed this lawsuit bringing claims under 42 U.S.C. § 1983 for (1) excessive force and unlawful arrest against Officers Pena, Obregon, and Curtis, and (2) municipal liability against the City of Port Lavaca, Texas. The Defendants filed a Motion to Dismiss all the Plaintiffs' claims except for Campos's excessive force claim against Officer Pena. (Dkt. No. 20 at 2). For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion to Dismiss.

I.      **BACKGROUND**

For purposes of this Motion, the Court takes as true the factual allegations made in the Plaintiffs' Amended Complaint. On August 27, 2018, Officer Obregon was driving

by Campos's residence when he observed an elderly couple arguing on the front lawn.
(Dkt. No. 18 at ¶ 10).  As it turns out, the couple was Campos's father and stepmother.
(*Id.*).  Officer Obregon ran a warrant check and learned that there was an active warrant
for the arrest of Campos's father for driving with an invalid driver's license.  (*Id.* at ¶ 11).
Officer Obregon called for backup to make the arrest, and Officers Curtis and Pena
arrived shortly thereafter.  (*Id.*).

At some point, the Officers went inside, and Campos entered the scene.  Campos's
father did not dispute the warrant and understood that he would be taken to jail.  (*Id.*).
Campos "greeted the officers and very calmly spoke to them about their presence at her
home, her father's health, and the pending warrant and the options that he had to either
pay for it or sit in jail."  (*Id.* at ¶ 13).  After discussing the options, Campos asked the
Officers if they could make the arrest and exit out the back door so that her young
children would not see it.  (*Id.* at ¶ 14).  The Officers agreed.  (*Id.*).

The Officers asked Campos's father to stand up, and Campos "placed an assuring
hand on her father's elbow."  (*Id.* at ¶ 15).  After that, Officer Pena "erupted and started
shouting" at Campos.  (*Id.*).  "Terrified" by Officer Pena's "sudden outburst," Campos
insisted that she wanted to pay the fine for her father so that he would not be arrested.
(*Id.*).  But she "in absolutely no way moved in a manner to present a threat" to the Officers
or anyone else.  (*Id.*).

Then, without warning or informing her that she was under arrest, Officer Pena
"grabbed Plaintiff Campos from behind, wrapped his arms around her neck and body,
and slammed her violently onto the couch."  (*Id.* at ¶¶ 16, 36).  Campos hit her head on

the wooden armrest.  (*Id.* at ¶ 16).  She began to lose consciousness, had ringing in her ears, experienced vision loss, and struggled to catch her breath after having the air knocked out of her.  (*Id.*).  Officer Pena stood over her as she stumbled to her feet, while Officers Obregon and Curtis stood by.  (*Id.* at ¶ 17).  Officer Pena then placed Campos into a wristlock and slammed her head on a wooden table below.  (*Id.*).  Campos stood up again but otherwise did not move.  (*Id.* at ¶ 20).  Then, without provocation or warning, Officer Pena shot Campos in the groin with his taser, leaving her "completely disabled."  (*Id.*).  He "used his baton to beat at and around her limp legs."  (*Id.* at ¶ 22).  Campos was placed in handcuffs and taken into custody.  (*Id.* at ¶¶ 22, 24).  Campos's family, including her small children, witnessed all of this.  (*Id.* at ¶¶ 18, 34).

Campos's niece, L.C.A., filmed these events on her phone and shouted to Campos that she was doing so.  (*Id.* at ¶¶ 9, 19, 25).  This apparently prompted Officer Pena to command Officer Obregon to detain her.  (*Id.* at ¶ 25).  Though L.C.A. was "sitting down and not interfering or obstructing the officers in any way," Officer Obregon "placed her in handcuffs and detained her in the back of a police vehicle."  (*Id.*).

Campos was taken to the hospital to be treated for her injuries before being booked into holding.  (*Id.* at ¶ 26).  While there, she overheard Officer Pena speaking to someone. She heard him specifically deny that the force he applied was excessive, brag that he "got her" in the p---y with his taser, and call her a "bitch."  (*Id.*).

Campos further alleges that all three of the Officers falsified claims in their reports as to what occurred that day.  (*Id.* at ¶¶ 27–29).  Campos was charged with "Interfering with Public Duties, Resisting Arrest, and Failure to ID."  (*Id.* at ¶ 30).  The charges against

3

Campos were ultimately dismissed.  (*Id.*).  Campos filed a complaint with the Port Lavaca Police Department to no effect.  (*Id.* at ¶¶ 37–38).

The Plaintiffs filed this lawsuit on August 27, 2020.  (Dkt. No. 1).  On December 9, 2020, the Plaintiffs amended their original Complaint.  (Dkt. No. 18).  The Defendants filed this Motion to Dismiss the Amended Complaint.  (Dkt. No. 20).  The Plaintiffs filed a Response, (Dkt. No. 21), and the Defendants replied, (Dkt. No. 22).  The Motion is ripe for review.

## II.    LEGAL STANDARDS

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss for "failure to state a claim upon which relief may be granted."  Rule 8(a)(2) requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,'" it demands more than labels and conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  The Defendants, as the moving parties, bear the burden of proving that no legally cognizable claim for relief exists.  5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed.).

In reviewing a 12(b)(6) motion to dismiss, a court must accept the plaintiff's factual allegations as true and view those allegations in the light most favorable to the plaintiff. *White v. U.S. Corrections, L.L.C.*, 996 F.3d 302, 306–07 (5th Cir. 2021).  The court must

4

evaluate whether "a complaint contains sufficient factual matter to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1949 (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "Dismissal . . . is appropriate where the plaintiff fails to allege 'enough facts to state a claim that is plausible on its face' and thus does not 'raise a right to relief above the speculative level.'" *Montoya v. FedEx Ground Package Sys., Inc.*, 614 F.3d 145, 148 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965).

The court need not look beyond the face of the pleadings in determining whether the plaintiff has stated a claim under Rule 12(b)(6). *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999); *accord Alamo Forensic Servs., L.L.C. v. Bexar County*, 861 F. App'x 564, 567 (5th Cir. 2021) (per curiam). And review is limited to the complaint's allegations and to the documents attached to a defendant's motion to dismiss to the extent those documents are referenced in the complaint and are central to the claims. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019).

Regarding Section 1983 claims, a plaintiff must allege (1) that she has been deprived of a right secured by the Constitution and the laws of the United States, by (2) persons acting under color of state law. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978).

## III.    DISCUSSION

The Plaintiffs allege that their Fourth Amendment right to be free from unreasonable searches and seizures was violated by Officers Pena, Obregon, and Curtis, (Dkt. No. 18 at ¶ 48), and that municipal liability attaches to the City of Port Lavaca as a result. (*Id.* at ¶ 56).  The Court now addresses whether each of these claims survives the Rule 12(b)(6) standard.

### A.    OFFICIAL CAPACITY CLAIMS

In their Amended Complaint, the Plaintiffs have sued the City of Port Lavaca, Texas, as well as Officers Pena, Obregon, and Curtis individually and in their official capacities.  (*Id.* at 1).  The Defendants move to dismiss all claims against the Officers in their official capacities because they are duplicative of the claims against the City of Port Lavaca.  (Dkt. No. 20 at ¶ 30).  The Plaintiffs do not address this argument in response. *See* (Dkt. No. 21).  The Court agrees with the Defendants.

"[O]fficial-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55, 98 S.Ct. 2018, 2035 n.55, 56 L.Ed.2d 611 (1978)).  As a result, an official capacity suit is "to be treated as a suit against the entity.  It is *not* a suit against the official personally, for the real party in interest is the entity."  *Id.* (quoting *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (emphasis in original)).  Based on this well-established rule, the Court dismisses the Plaintiffs' claims against Officers Pena, Obregon,

and Curtis in their official capacities as duplicative of their claims against the City of Port Lavaca.  *See Garza v. Escobar*, 972 F.3d 721, 734 (5th Cir. 2020).

### B.    UNLAWFUL ARREST AND DETENTION

Campos alleges that the Officers seized and arrested her unlawfully.  (Dkt. No. 18 at ¶ 45).  Campos claims that Officer Pena grabbed her from behind, wrapped his arms around her neck and body, and slammed her violently.  (*Id.* at ¶ 16).  She also claims that Officers Pena, Obregon, and Curtis took her into custody, (*id.* at ¶ 24), where she was arrested and charged with "Interfering with Public Duties, Resisting Arrest, and Failure to ID." (*Id.* at ¶ 30).  But she contends that no probable cause existed for her arrest.  (*Id.* at ¶ 32).  To support these claims, Campos states that she "very calmly spoke to [the Officers] about their presence at her home," (*id.* at ¶ 13) and did not disagree or argue with the Officers about whether there was an active warrant for her father's arrest, (*id.*).  She also states that she "in absolutely no way moved in a manner to present a threat to any officer, herself, or others." (*Id.* at ¶ 15).  Finally, she states that the Officers falsified their reports, claiming that Campos had been the aggressor during the incident.  (*Id.* at ¶¶ 27–29).

The Defendants argue that Campos's claims fail because her "continued assault on and interference with the Officers at the very least created probable cause for her arrest." (Dkt. No. 20 at ¶ 20).  The Defendants further argue that "Campos was noncompliant, physically interfered with the Officers' ability to arrest her father and became increasingly combative." (*Id.* at ¶ 21).  They specifically contend that she "failed to identify herself to the Officers," "attacked Officer Pena and pushed Officer Obregon,"

and "was then escorted out of the house and placed into police custody." (*Id.*). In support of these contentions, the Defendants rely on patrol car audio from Officers Obregon and Pena and body camera footage from Officers Pena and Curtis. (*Id.* at ¶ 7).

Campos responds that "the video evidence . . . failed to support claims that probable cause existed" for her arrest. (Dkt. No. 21 at 12). She claims that "Defendant Obregon's in-car audio does not, at any time, provide conclusive evidence of what went on inside of [her] home where the wrongful detention/arrest took place" and that "Defendant Pena's body camera was activated only moments before he tased [her]." (*Id.*).

L.C.A. alleges that "Defendant Pena and Defendant Obregon acted intentionally in contradiction of public interest in interfering with [L.C.A.'s] right to personal security and privacy." (Dkt. No. 18 at ¶ 35). She further argues that "[e]ven if Defendants believed anyone had reasonable suspicion to detain [her], the length, manner, and scope of the detention was clearly unreasonable[.]" (*Id.*). The Defendants argue that L.C.A. "was only detained for less than 10 minuets [sic] because she was attempting to reescalate the situation and interfering with the Officers." (Dkt. No. 20 at ¶ 21). Thus, probable cause existed for her brief detention. (*Id.*).

To establish a wrongful arrest claim, the plaintiff must show that she was arrested without probable cause. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009); *Sorenson v. Ferrie*, 134 F.3d 325, 328 (5th Cir. 1998). "Reasonable suspicion" is required for brief detentions, *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994), unless a "reasonable person in the suspect's position would understand the situation to be a restraint on freedom of the kind that the law typically associates with a formal arrest," in

which case, the detention requires probable cause.  *Freeman v. Gore*, 483 F.3d 404, 413 (5th Cir. 2007).

At the motion to dismiss stage, the Court may only consider "(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Walker*, 938 F.3d at 735. Additionally, "[w]hen a defendant attaches documents to its motion [to dismiss] that are referred to in the complaint and are central to the plaintiff's claims, the court may also properly consider those documents." *Id.*

In addressing the Motion to Dismiss, the Court cannot consider the video and audio recordings relied on by the Defendants for two reasons.  First, the recordings are not matters of which the Court can take judicial notice.  As the text of the Federal Rules of Evidence make clear, the Court can judicially notice facts that are "not subject to reasonable dispute."  Fed. R. Evid. 201(b); *accord Basic Capital Mgmt., Inc. v. Dynex Capital, Inc.*, 976 F.3d 585, 589 (5th Cir. 2020).  In this case, the Parties reasonably dispute the contents of the recordings.  *See, e.g.*, (Dkt. No. 21 at 12) ("[A]bsolutely no 'attack or push' is recorded on any of the Defendants' exhibits.").  Additionally, the Defendants rely on the recordings for their contents, not their mere existence.  Thus, judicial notice is improper.  *See Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 604 (W.D. Tex. 2014).

Second, the recordings are not central to the Plaintiffs' claims.  *Dawes v. City of Dallas* is instructive.  No. 3:17-CV-01424-X-BK, 2020 WL 3603090 (N.D. Tex. July 2, 2020) (Starr, J.).  There, the district court noted that while "the Fifth Circuit has not enunciated a test for when a document is central to a plaintiff's claim, a document tends to be central

9

when it is necessary to establish an element of a plaintiff's claim." *Id.* at *2.  The district court went on to hold that despite being referenced five times in the plaintiff's complaint, the body camera recordings at issue were not central to the plaintiff's claims because other evidence "could also establish what occurred at the scene." *Id.* at *2–3.  The district court reasoned that "the body camera recordings are not central to the plaintiffs' claims in this case because they are not necessary to establish an element of the plaintiffs' [claims] in the same way that a contract is necessary for a breach of contract claim." *Id.* at *3.  Likewise, the recordings in this case are not central to Campos's claims because they are not necessary to establish what occurred.  *See id.*; *see also Turk v. Mangum*, No. 4:15-CV-1003, 2016 WL 11529682, at *1 (S.D. Tex. June 20, 2016) (Hittner, J.) ("The video here merely records the events on which suit is based, it does not create the events on which suit is based.").  Thus, the Court may not consider the recordings.

At this stage, all the Court may consider are the Plaintiffs' allegations, taken as true.  *White*, 996 F.3d at 306–07.  Here, Campos claims that Officer Pena "[w]ithout warning, . . . suddenly grabbed Plaintiff Campos from behind, wrapped his arms around her neck and body, and slammed her violently onto the couch."  (Dkt. No. 18 at ¶ 16).  Campos alleges that she "in absolutely no way moved in a manner to present a threat to any officer, herself, or others."  (*Id.* at ¶ 15).  Taken as true and viewed in the light most favorable to Campos, these facts plausibly state a claim that the Defendants lacked probable cause to seize and arrest her. As a result, the Defendants have not met their burden under Rule 12(b)(6) on these claims.

Similarly, L.C.A. claims that she was "sitting down and not interfering or obstructing the officers in any way when Defendant Obregon placed her in handcuffs and detained her in the back of a police vehicle" and that she "in no way[] attempted to re-escalate the scene[.]" (*Id.* at ¶ 25). Based on the allegations in the Amended Complaint, it appears that L.C.A. was detained because she filmed the encounter. (*Id.*). But this is not a lawful basis for a police officer to detain someone. *See Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017). Regardless of whether the Officers needed probable cause or reasonable suspicion to detain L.C.A., based on her allegations, the Officers had neither. Taken as true and viewed in the light most favorable to L.C.A., these facts plausibly state a claim that she was seized unlawfully. As a result, these claims survive the Rule 12(b)(6) motion.

### C.    FAILURE TO INTERVENE

In their Motion to Dismiss, the Defendants do not challenge Campos's claim against Officer Pena for excessive force. (Dkt. No. 20 at ¶ 2). But Campos also asserts an excessive force claim against Officers Obregon and Curtis, based on their failure to intervene to stop Officer Pena's alleged violation of Campos's constitutional rights. (Dkt. No. 18 at ¶ 49); (Dkt. No. 21 at 15–17). The Defendants dispute this claim. (Dkt. No. 20 at ¶¶ 27–28). They argue that even assuming that Campos's rights were being violated, "Officer Obregon and Officer Curtis did not have knowledge that Plaintiff Campos' constitutional right[s] were going to be violated nor did they have any reasonable opportunity to prevent any harm that occurred and chose not to do so." (*Id.* at ¶ 28). This

is established, they argue, based on Campos's own description of Officer Pena's force being applied "without warning." (*Id.*).

L.C.A. likewise asserts a claim for failure to intervene to stop her allegedly unconstitutional detention. (Dkt. No. 18 at ¶ 50). The Defendants dispute this claim as well. (Dkt. No. 20 at ¶ 29). They contend that L.C.A.'s failure to intervene claim fails because the Amended Complaint does not "identify who exactly used force against [L.C.A.]" and that because the "Plaintiffs assert this claim against all Defendants[,] . . . all three officers by definition cannot fail to intervene in conduct that theoretically one of them had to have personally committed themselves, and one cannot fail to intervene in his own conduct." (*Id.*).

To establish a failure to intervene claim, the plaintiff must allege that the officer (1) knew that a fellow officer was violating an individual's constitutional rights, (2) had a reasonable opportunity to prevent the harm, and (3) chose not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). One focus of the bystander-liability inquiry is upon whether the bystander officer has "a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995). An officer's mere presence at the scene, without more, is insufficient to establish a claim for failure to intervene. *Vasquez v. Chacon*, No. 3:08-CV-2046-M (BH), 2009 WL 2169017, at *6 (N.D. Tex. July 20, 2009), *aff'd*, 390 F. App'x 305 (5th Cir. 2010) (per curiam). "In evaluating whether an officer took reasonable measures to protect a suspect, courts have considered both the duration of the alleged use of excessive force by other officers

and the location of the suspect relative to the officer against which a claimant seeks bystander liability." *Id.* (collecting cases).

It is true that for some applications of force by Officer Pena, Officers Obregon and Curtis did not have "a reasonable opportunity to prevent the harm." *Whitley*, 726 F.3d at 646. The first time Campos alleges that Officer Pena applied force against her is described as "[w]ithout warning" and happening "suddenly." (Dkt. No. 18 at ¶ 16). Campos also describes Officer Pena's later use of his taser against her as "without warnings or commands to Plaintiff Campos or provocation by Plaintiff Campos whatsoever toward Defendants[.]" (*Id.* at ¶ 20). As a result, Campos has not alleged sufficient facts to state a claim against Officers Obregon and Curtis for failure to intervene based on these actions because, based on Campos's allegations, they had no reasonable opportunity to intervene to stop them.

But that is not all that Campos alleges. After Officer Pena's first application of force against Campos, she claims that more excessive force followed. She contends that Officer Pena stood over her while she stumbled to her feet. (*Id.* at ¶ 17). Then, she states that Officer Pena "attacked Plaintiff Campos again, placing her into a wristlock and slamming her head violently down to a wooden table below her." (*Id.*). Later, after she had just been tasered, she claims that Officer Pena "used his baton to beat at and around her limp legs." (*Id.* at ¶ 22). All the while, she alleges Officers Obregon and Curtis were in the same room looking on. *See generally* (*Id.* at ¶¶ 17–18, 21–22). Reading these allegations in the light most favorable to Campos, as it must, the Court concludes that Campos has alleged facts sufficient to survive the Defendants' Motion to Dismiss the

13

claim against Officers Obregon and Curtis for excessive force under a failure to intervene theory. While not all of the allegations that Campos alleges are sufficient, she has alleged some facts demonstrating that Officers Obregon and Curtis knew Officer Pena was violating Campos's constitutional rights, had a reasonable opportunity to prevent the harm, and chose not to act. *See Whitley*, 726 F.3d at 646.

It appears that the Defendants misunderstand L.C.A.'s unlawful detention claim based on a failure to intervene theory. In their Motion to Dismiss, the Defendants attack L.C.A.'s claim by arguing that she failed to allege that excessive force was used against her. (Dkt. No. 20 at ¶ 29). But L.C.A.'s failure to intervene argument is based on her unconstitutional *detention* claim—not an excessive force claim. (Dkt. No. 18 at ¶ 50). The Plaintiffs confirmed this in their response. (Dkt. No. 21 at 15 n.1) ("[L.C.A.] is not asserting a claim for excessive force under any theory of liability."). Regardless, L.C.A. has alleged sufficient facts to support her failure to intervene theory against Officer Pena and Officer Curtis.[1] As discussed above, she has alleged facts which, taken as true, establish that she was detained without reasonable suspicion or probable cause. And while the Plaintiffs do not state how long L.C.A. was detained, the Defendants contend in their Motion to Dismiss that she was held for approximately ten minutes. (Dkt. No. 20

---

[1]   L.C.A. does not specifically allege which Defendants failed to intervene to stop her detention. Rather, she states this claim against all three Defendants. (Dkt. No. 18 at ¶ 50). As the Defendants point out, "all three officers by definition cannot fail to intervene in conduct that theoretically one of them had to have personally committed themselves, and one cannot fail to intervene in his own conduct." (Dkt. No. 20 at ¶ 29). But in the Plaintiffs' fact section of their Amended Complaint, which is incorporated into their claims section, they allege that "Defendant Pena commanded Defendant Obregon to detain [L.C.A.]" (Dkt. No. 18 at ¶ 25). Thus, the Court construes L.C.A.'s claim for failure to intervene as brought against Officers Pena and Curtis.

at ¶ 6).  These allegations are sufficient to support L.C.A.'s claim that she was detained in violation of her constitutional rights, and that she was detained long enough for the other Officers to have a reasonable opportunity to intervene and yet they chose not to. *See Whitley*, 726 F.3d at 646.  Thus, L.C.A.'s unlawful detention claim under a failure to intervene theory survives the Defendants' Motion to Dismiss as well.

###    D.    MUNICIPAL LIABILITY

The Plaintiffs also assert a claim for municipal liability against the City of Port Lavaca under Section 1983.  Municipalities are "persons" under Section 1983.  *Monell*, 436 U.S. at 690–91, 98 S.Ct. at 2035–36.  But because no municipal liability exists under the doctrine of respondeat superior, a plaintiff must show that the municipality's policy or custom caused the constitutional violations.  *World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 752–53 (5th Cir. 2009).  Thus, to state a claim for municipal liability based on the misconduct of an employee, the plaintiff must allege facts showing that "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right."  *Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018) (quotations and citations omitted).

With respect to the first element—official policy—the Plaintiffs advance two theories: an informal custom or practice of using excessive force and a custom or practice of inadequate training and supervision.[2]  *See* (Dkt. No. 18 at ¶¶ 56–57).  The Defendants

---

[2]    The Plaintiffs assert numerous theories to show an official policy, many of which overlap.  They claim that the City sanctioned the practices of:

(continue)

contend that the Plaintiffs' failed to sufficiently plead these claims, and therefore they must be dismissed. (Dkt. No. 20 at ¶¶ 14, 18). The Plaintiffs dispute this contention. (Dkt. No. 21 at 17–19). The Court analyzes both of the Plaintiffs' theories to determine whether they properly allege an official policy.

### 1.   Widespread Practice Theory

The Plaintiffs' first theory is that the City's informal custom or practice of using excessive force constitutes an official policy under municipal liability analysis. The Plaintiffs allege that the City is liable "because the 'turns a blind eye' or 'get their story together' or 'code of silence' approach" to incidents involving excessive force "is a persistent, widespread practice of the city employees—namely police officers—that, although not authorized by officially adopted policy, is so common and well settled as to constitute a custom that fairly represents official policy." (Dkt. No. 18 at ¶ 59). The Defendants argue that the Plaintiffs fail to adequately state a claim because they do not "allege any facts constituting an actionable claim against the City under §1983 for

---

(1) using excessive force to effectuate what are otherwise routine arrests, (2) using excessive force when such is not necessary and/or allowable, (3) ignoring the serious need for training and supervision of their officers in regards to the use of force, (4) failing to discipline those persons whom are found to have engaged in the use of excessive force upon those entrusted to their care and/or under their control, (5) failing to adequately supervise and/or observe their employees and/or officers, (6) failing to provide adequate training in regard to the availability of alternative means of detaining persons apart from the use of excessive force, and (7) failing to train officers in the proper use of force for prevention of escape and/or detention.

(Dkt. No. 18 at ¶ 56). The Plaintiffs also state that "[i]n the alternative," municipal liability may be attached through the City's "inadequate training of their officers" and the failure to "adopt clear policies" outlining when excessive force may be used. (*Id.* at ¶¶ 60–61). The Court construes these allegations as the Plaintiffs' attempt to assert two separate official policy theories: a "widespread practice" theory and a "failure-to-train" theory.

sanctioning a custom, practice, policy and/or procedure of a violation of the Plaintiffs['] Fourth Amendment rights under the Constitution." (Dkt. No. 20 at ¶ 15). Specifically, the Defendants contend that the Plaintiffs "simply make the conclusory allegations that the City [is] liable under *Monell*," "with no specific facts describing the policy or customs that allegedly are in existence." (*Id.* at ¶¶ 15, 17). The Plaintiffs respond that they have stated sufficient facts to attach liability because they alleged that "Defendant Pena falsified charges and Defendant Curtis and Defendant Obregon supported those facts to justify the use of force" because of the "code of silence," "turn a blind eye," or "get their story together" practices. (Dkt. No. 21 at 18). The Plaintiffs also allege that the City's failure to discipline the Officers in this instance supports their widespread practice theory. (Dkt. No. 18 at ¶ 58(e)).

Although official policy "usually exists in the form of written policy statements, ordinances, or regulations," it may also exist "in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009) (quotations omitted). To plausibly "plead a practice so persistent and widespread as to practically have the force of law, [the plaintiff] must do more than describe the incident that gave rise to his injury." *Ratliff v. Aransas County*, 948 F.3d 281, 285 (5th Cir. 2020) (quotations omitted). Instead, the plaintiff must demonstrate "a pattern of abuses that transcends the error made in a single case." *Piotrowski v. City of Houston*, 237 F.3d 567, 582 (5th Cir. 2001). A single constitutional violation, therefore, is usually insufficient. *Id.* at 581. Rather, a plaintiff must allege, for example, "a pattern of similar incidents." *Fraire v. City of Arlington*, 957

17

F.2d 1268, 1278 (5th Cir. 1992).  "Where prior incidents are used to prove a pattern, they must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees."  *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009) (quotations omitted).

The Plaintiffs do not provide any facts indicating a pattern demonstrating a widespread practice other than the one encounter they had with the Defendants.  Based on this single encounter and the City of Port Lavaca's inaction following their complaints, the Plaintiffs claim that the City "turns a blind eye" to and has a "code of silence" regarding police officers' use of excessive force, unlawful arrest, and falsification of criminal charges, and that such constitutional malfeasance is so widespread as to constitute official policy.  (Dkt. No. 18 at ¶ 59).  But they do not articulate any additional facts to support that claim.  For example, the Plaintiffs do not plausibly allege that Port Lavaca police officers used excessive force against anyone else.  *See Villarreal v. City of Laredo*, 17 F.4th 532, 546 (5th Cir. 2021) (affirming the district court's judgment dismissing a municipal liability claim based on "custom" because the plaintiff did "not allege that city employees retaliated against, investigated, or arrested anyone else because of their speech").  Thus, the Court dismisses the Plaintiffs' municipal liability claim based on a "widespread practice" official policy theory.

## 2.    **Failure-to-Train Theory**

The Plaintiffs also seek to demonstrate an official policy using a failure-to-train or supervise theory.  They argue that the City failed "to provide adequate training in regard

to the availability of alternative means of detaining persons apart from the use of excessive force" and "to train officers in the proper use of force for prevention of escape and/or detention."  (Dkt. No. 18 at ¶ 56).  The Plaintiffs further allege that the City's failure "to adequately train, supervise and discipline police officers" amounts to "deliberate indifference."  (*Id.* at ¶ 58).  In the alternative, the Plaintiffs argue, the City is liable for its failure to adopt criteria regarding when to use force against non-suspects in low-risk environments and policies "outlining the need to intervene when another officer" is violating a person's rights.  (*Id.* at ¶ 60).

"A municipality's failure to train its police officers can without question give rise to § 1983 liability."  *World Wide Street*, 591 F.3d at 756.  However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011).  For liability to attach to a municipality due to an alleged failure to train police officers, a plaintiff must show: "(1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question."  *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010) (citing *World Wide Street*, 591 F.3d at 756).

A plaintiff must "allege with specificity how a particular training program is defective."  *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005).  Further, "a plaintiff must plausibly allege that the municipality was deliberately indifferent to the need for proper training."  *Anokwuru v. City of Houston*, 990 F.3d 956, 965–66 (5th Cir.

19

2021).  To show deliberate indifference, the plaintiff must demonstrate "that in light of the duties assigned to specific officers or employees, need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *World Wide Street*, 591 F.3d at 756 (quotations omitted).  "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 1391, 137 L.Ed.2d 626 (1997) (cleaned up).  As such, "[c]laims of inadequate training generally require that the plaintiff demonstrate a pattern of conduct."  *Sanders-Burns v. City of Plano*, 594 F.3d 366, 382 (5th Cir. 2010).  Without a pattern of similar incidents, a plaintiff generally fails to demonstrate deliberate indifference.[3]  *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 382–83 (5th Cir. 2005).

---

[3]     The Supreme Court "left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference."  *Connick*, 563 U.S. at 63, 131 S.Ct. at 1361 (citing *Brown*, 520 U.S. at 409, 117 S.Ct. at 1391).  The Supreme Court "posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force."  *Id.*  Since police frequently attempt to arrest fleeing felons and the likelihood that an officer lacking specific tools to handle such a situation will violate Constitutional rights, the Supreme Court theorized that a city's decision not to train the officers about the constitutional limits of the use of deadly force could reflect the city's deliberate indifference to such a highly predictable consequence.  *Id.* at 63–64.  Nevertheless, the Plaintiffs do not allege facts suggesting that the City offered no relevant training at all to Officers Pena, Obregon, and Curtis or that the City ignored a highly predictable consequence.  Thus, the Plaintiffs' allegations do not rise to the level of the Supreme Court's hypothetical such that it would invoke the "single-incident" liability on which the Supreme Court opined.

In this case, the Plaintiffs offer the conclusory allegation that "[l]iability attaches [to the City] because its failure to train officers amounts to deliberate indifference to the rights of the persons with whom they come in contact." (Dkt. No. 18 at ¶ 61). The Plaintiffs do not state how the City's current training practices and standards are inadequate. Nor do they allege any other fact that may show a pattern of incidents that may demonstrate deliberate indifference. The Plaintiffs also do not state any allegation with respect to Officers Pena, Obregon, or Curtis's individual training and qualifications. Because the Plaintiffs have not plausibly alleged inadequate training and deliberate indifference, the Court need not analyze the causation element of a failure-to-train theory. *See Zarnow*, 614 F.3d at 170–01; *see also Ratliff*, 948 F.3d at 285 (affirming the district court's Rule 12(b)(6) dismissal because the plaintiff failed to sufficiently plead one of the elements of the failure-to-train theory). Thus, the Plaintiffs' failure-to-train theory does not survive Rule 12(b)(6) review. Without plausible allegations indicating that the training procedures are inadequate and why the City was deliberately indifferent in adopting its training policy, the Plaintiffs have failed to allege an official policy based on a failure-to-train or supervise theory. *See Anokwuru*, 990 F.3d at 966.

In sum, the Plaintiffs have failed to allege an official policy under either of the two theories they advance. They have not alleged plausible facts that the City of Port Lavaca had an informal custom or practice of applying and condoning excessive force, nor have they plausibly alleged a custom or practice of inadequate training and supervision. An official policy is a required element of a municipal liability claim. *Peña*, 879 F.3d at 621. Because the Plaintiffs have not plausibly shown an official policy, the Court need not

address the other two elements of a municipal liability claim. *See id.* (explaining that a plaintiff "must plead facts that plausibly support *each* element of § 1983 municipal liability" (emphasis added)).  The Court dismisses the Plaintiffs' municipal liability claims against the City of Port Lavaca.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendants' Motion to Dismiss.  The Court **DISMISSES WITH PREJUDICE**[4] the Plaintiffs' municipal liability claims against the City of Port Lavaca, Texas for failure to establish an official policy.  The Court also **DISMISSES WITH PREJUDICE** the Plaintiffs' claims against Officer Pena, Officer Obregon, and Officer Curtis in their official capacities as duplicative of their claims against the City.  The Plaintiffs' remaining claims against Officers Pena, Obregon, and Curtis in their individual capacities survive.  The Court **DENIES** all other requested relief in the Motion to Dismiss.

It is SO ORDERED.

Signed on December 8, 2021.

*Drew B. Tipton*

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**

---

[4]   During the November 2, 2021 status conference, the Plaintiffs' counsel stated to the Court that the Plaintiffs do not intend to further amend their complaint.  Further, the deadline for motions for leave to amend pleadings has passed.  *See* (Dkt. No. 15).  For these reasons, the Court dismisses the Plaintiffs' claims against the City of Port Lavaca and claims against the Officers in their official capacities with prejudice.